# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### July 28, 2009 Session

## STATE OF TENNESSEE v. ANTHONY DEWAYNE HOOD

### Appeal from the Criminal Court for Union County
### No. 3182    E. Shayne Sexton, Judge

### No. E2008-02298-CCA-R3-CD - Filed September 10, 2010

The Defendant, Anthony DeWayne Hood, appeals from his conviction by a jury in the Union County Criminal Court for sexual battery by an authority figure, a Class C felony, for which he was sentenced as a Range I, standard offender to six years in the Department of Correction. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his conviction, (2) the trial court denied his right to a fair trial when it responded in the jury's presence to the Defendant's motion for judgment of acquittal that the burden had been met, (3) the trial court erred in allowing the State to introduce irrelevant, unfairly prejudicial, and improper character evidence, (4) there was prosecutorial misconduct because the State misstated the evidence during opening statement and closing argument and commented on the credibility of a witness, and (5) his sentence is excessive because the trial court misapplied an enhancement factor and denied alternative sentencing. We conclude that the trial court committed reversible error when it stated in the jury's presence that the State's burden of proof had been met. We reverse the judgment of the trial court and remand the case for a new trial.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed; Case Remanded

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Wesley D. Stone, Knoxville, Tennessee, for the appellant, Anthony Dewayne Hood.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William Paul Phillips, District Attorney General; and Tracy Tipton Jenkins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This appeal arises from the Defendant's conviction for sexual battery of his adopted daughter, B.H. Leisha Hicks testified that she met the Defendant when she was fifteen years old and he was seventeen years old, when they lived in Jamestown, Tennessee. She said they "fell madly in love" and got married when she turned eighteen. She said that they divorced in 1986 but that they remained friends, even though they remarried other people. She said that the Defendant moved to Mississippi in 2001 or 2002 after his wife went to prison and that she communicated with him on the telephone often during this period. She said that the Defendant lost his home in Hurricane Katrina and that he and his five children moved to Jamestown. She said that she helped the Defendant find a house in Maynardville and that they moved in together on October 1, 2005. She said that her friend, Margaret Helton, moved in for about a week before the alleged offense occurred.

Ms. Hicks testified that she observed the relationship between the Defendant and the victim. She said B.H. was the oldest child–fifteen at the time–and was in charge of the younger children. She said that B.H. was very possessive of her father and that at first, "it was sort of like I was stepping in on her turf." She said that she got along well with the four younger children and that B.H. had done a great job with them. She said the "competition" with B.H. lasted a few weeks and then improved. She said she noticed things about B.H.'s relationship with the Defendant that were "strange." She said every time the Defendant went somewhere, B.H. went with him. She said that if B.H. was not in the vehicle when the Defendant tried to leave the house, B.H. would "throw screaming tantrum fits." She said B.H. always had to be sitting next to the Defendant, almost in his lap, or sitting at his feet. She said she thought this was odd.

Ms. Hicks testified that on the night of November 16, 2005, she went to bed early. She said that she awoke to use the bathroom and that when she walked out of her room, she saw that the Defendant was not on the couch where he usually slept. She said she searched through the house and looked out the window and saw his vehicle in the driveway. She said that the younger children slept upstairs and that it was dark and quiet. She said the only other place the Defendant could have been was in B.H.'s room. She said that she walked down the hall toward B.H.'s room and that the door was slightly ajar. She said the light switch was located on the outside of the room. She said she pushed open the door and flipped on the light at the same time. She said that B.H. was completely nude, lying on her stomach, with her "hind end" raised slightly, and the Defendant's face was four or five inches from B.H.'s genitals.

Ms. Hicks testified she was so shocked that she walked out of the room and into the kitchen. She said she did not remember the first few exchanges with the Defendant. She

stated he grabbed her arm and said, "If you ever tell anybody, I swear to God, I'll kill you." She said he was serious. She said the Defendant next said, "I will have her testify in Court that Margaret [Helton] was fooling with her." She said that she knew the Defendant kept a gun in the house and that she was frightened. She said she dressed quickly and slipped out the front door while the Defendant was talking to Margaret Helton. She said she ran to the nearest neighbor's house and called the police. She stated that the police responded quickly and that she did not return to the house until a couple of weeks later to retrieve her belongings.

Ms. Hicks testified that the first few weeks after the incident, the Defendant repeatedly called her mother's house threatening to kill her. She said she obtained an order of protection against him. She said that she had contact with the Defendant again a year before the trial and that the Defendant threatened her.

On cross-examination, Ms. Hicks testified that after she saw the Defendant with B.H. in the bedroom, she put her clothes on directly over her pajamas. She denied that she and the Defendant argued for about ten minutes. She said that "some words" were spoken but that it lasted only a few minutes. She did not remember whether she told the neighbors that she saw the Defendant having or performing oral sex with B.H. She said she told the neighbors she needed help and to call 9-1-1. She said that she was at the neighbor's house for about two hours and that she did not remember discussing the incident with them, although she said it was possible. She said, however, that the police questioned her at length in the neighbor's living room.

Ms. Hicks testified that when she walked into B.H.'s room, the Defendant was wearing blue shorts. She said that she and the Defendant had sex in the house "a couple of times" and that it "was very limited." She denied that they had sex in different rooms. She said they had sex only in her bedroom. She said the Defendant sometimes ejaculated inside her and sometimes he withdrew before ejaculating. She denied that the Defendant kicked her out of the house on November 16. She said she slipped out while the Defendant was talking to Ms. Helton and "just ran." She agreed that she left the children at the house with the Defendant. She acknowledged that although she saw the Defendant's face four or five inches from B.H.'s genitals, she did not see any sexual contact.

Ms. Hicks testified that she lived in a recovery home in Nashville. She said that she had received inpatient drug rehabilitation treatment and that she had not used drugs for almost one year. She acknowledged that she had been addicted to prescription medication when she lived with the Defendant. She said that regarding the night she found the Defendant with B.H., she had taken a couple of hydrocodone pills earlier in the day. She said that she had been prescribed some nerve medication at the time and that she might have taken

one of those pills. She did not remember drinking alcohol that day, although she acknowledged that she drank alcohol sometimes when she lived there. When asked if she were taking hydrocodone in excess, she said, "At that time, not—I was totally in all my faculties, if that's what you're getting at. I was not out of my gourd high on pills." When asked whether she was aware of accusations that she fabricated the story, she said that she was. She said that B.H. had called her at her mother's house one time after November 16.

On redirect examination, Ms. Hicks testified that their families were from Jamestown and that the Defendant had told anyone who would listen that she fabricated the story. She said she had valid prescriptions for the medications she was taking. She confirmed that she and the Defendant had sex only in her bedroom. She said she never saw the defendant masturbate elsewhere in the house. When asked if she had ever had sex on the couch, she responded, "With five kids in the house, no."

Ms. Hicks testified that the span of time during which she observed the Defendant with his face next to B.H.'s naked genitals was short. She said that the Defendant was leaning over and that when the lights came on, he immediately straightened and looked at her. She said she turned and walked out. She confirmed that B.H. was totally nude and that her rear end was in the air. She said B.H. was not completely on her knees.

B.H. testified that she was seventeen at the time of the trial. She testified that the Defendant was her father but not her biological father. She said he adopted her when she was three years old. She said that Amy Hood was her mother and that her mother left when she was ten. She said that she had sisters and a brother and that her father took care of them when their mother left, both in Mississippi and in Tennessee.

B.H. testified that on the night of November 16, she was taking Elmiron, hydroxyzine, and pain medication. She said the medications made her sleep. She said she was not feeling well that night and lay on the couch. She said her father woke her up between 8:30 p.m. and 9:30 p.m. and told her to take a shower, to eat, to take her medicine, and to go to bed. She said she was asleep for a few minutes and then was awakened because she heard Ms. Hicks and her father arguing. She said she did not think much about it because they had been arguing all week. She said she went into the kitchen, got something to drink, returned to her room, and turned on the television. She said she then heard yelling and Ms. Hicks's saying she was leaving and slamming the door. She said the next thing she remembered was that a policeman arrived and asked her what was going on. She could not remember what was playing on television that night. She said she had described all she remembered about that night.

-4-

B.H. testified that she had a conversation with the Defendant following that night. She said the Defendant told her that it was her fault, that she was going to cause him to lose his "real" kids and go to jail, and that none of it would have happened had it not been for her. She said she did not know what the Defendant was talking about when he said all this would never have happened if it were not for her. She denied the Defendant had made any threats toward her. She said the Defendant contacted her at her foster mother's house.

On cross-examination, B.H. testified that on the night of November 16, she was wearing gray sweatpants and a t-shirt. She said she had not been wearing those clothes while she had been sleeping on the couch. She said she had put the clothes on because she slept in them every night. She agreed that she had slept in them on three or four nights without their being washed. She acknowledged that while wearing those clothes she had gone into Ms. Hicks's bedroom, sat on her bed and floor, and lounged around the house. She agreed that she remembered waking to Ms. Hicks and the Defendant's arguing, walking to the kitchen, getting something to drink, returning to her room, and turning on the television.

B.H. testified that Ms. Hicks and the Defendant argued often. When asked if she threw "screaming fits" when her father would leave the house without her, she said "it kind of made me mad because . . . I was kind of jealous that Dad didn't do anything with me anymore." She said the Defendant was focused on Ms. Hicks and he "kind of put us aside." She agreed she had fits. She said she was taking medication because she had interstitial cystitis, which she explained was a chronic bladder disease which she had had for nearly two years. She agreed that she had a procedure shortly before November 16 that caused dampness or her bladder to leak.

On redirect examination, B.H. testified that when she awoke on the night of November 16, she was wet, but she assumed that it was from the treatments because it had happened before. When asked if she had considered other possibilities for the wetness, she said that at the time, she had not. She said she later thought there might be another possibility. She said that for a long time, she did not think that anything had happened between her father and her, but that by the time of the trial, she felt as if something had occurred. She said, for example, that the telephone conversation with her father "kind of fits in and it kind of makes sense now."

B.H. testified that it could not have been more than fifteen or twenty minutes from the time she went to bed until she awoke to arguing. She could not remember exactly how long it was before she went to bed that she took her medicine, but she thought it had been about fifteen to twenty minutes.

On recross-examination, B.H. testified that, initially, she did not believe anything had happened to her. She agreed that she had begun to believe that something may have happened based upon what she had learned about her father. She acknowledged that she formed that opinion based on what Detective Minor, the Child Protective Services officers, and the Department of Children's Services officers told her they thought had happened. She denied knowledge of a criminal charge against the Defendant.

Detective Rodney Minor testified that he responded to the call at the Defendant's residence because he was the sex crimes investigator for Union County. He said that he specialized in child abuse sex crimes and that he had received special training. He testified that he arrived at the Defendant's residence at 11:40 p.m. and that other officers were present. He said that B.H. was in and out of sleep and that they had to wake her. He said she was wearing gray sweatpants and was wrapped in a blanket and lying crossways on her bed. He said he first talked to Ms. Hicks. He said the Defendant made an oral statement, which he transcribed, while they sat at the table waiting for the Department of Children's Services to arrive. The Defendant stated that if "anything" were found on B.H. or in her bedroom, he was guilty. He said the Defendant agreed to DNA testing, and he identified the buccal swab taken from the Defendant.

Detective Minor testified that he and a nurse at the hospital collected the sweatpants and sent them to the Tennessee Bureau of Investigation (TBI). He said that the nurse put the sweatpants in the evidence bag because he did not remain in the examination room while the victim was being tested with the rape kit but that he helped seal the bag. Detective Minor identified the sweatpants that the victim had been wearing. He said that he and a DCS worker talked to B.H. at the emergency room. He said that a doctor performed the sexual assault kit and that a blood sample was taken from B.H., which he forwarded to the TBI.

Detective Minor testified that he did not arrest the Defendant that night because he needed to finish his investigation by speaking with the Defendant's other children. He said the Defendant was not arrested until a few months later when the TBI tests returned a positive match for spermatozoa. He said the Defendant made a written statement.

On cross-examination, Detective Minor said he chose not to arrest the Defendant until he had received the TBI report. He said that the Defendant's DNA was found on the sweatpants but no where else. He said that he also sent the following items to the TBI: the sexual assault kit, a shirt, a bra, a bedspread, and the hospital sheet on which the victim stood while the evidence for the assault kit was collected. When asked to confirm that the DNA being found did not prove unlawful sexual contact, Detective Minor responded that when a victim went to bed wearing clothes and someone saw the victim with clothes off, there had

to be some type of contact to get the clothes off. He said that based upon his opinion and his experience as an investigator of sex crimes, he arrested the Defendant.

Special Agent Donna Nelson, a forensic scientist in the Serology/DNA unit of the TBI, was accepted as an expert on serology and DNA. She said that she tested a DNA standard from the Defendant against an unknown profile from a pair of sweatpants from the victim. She identified the sweatpants as the ones she analyzed and explained that markings on the sweatpants were areas that tested presumptively positive for the presence of semen. She said that she then took one cutting in order to make a slide to determine the presence of sperm. She said that she found sperm on the sweatpants. She said she did not take cuttings from the other sections that had tested presumptively positive for semen. Upon a question from a juror, she testified that the area tested was the left rear of the pants. She said that the semen matched the Defendant's DNA but that no other DNA evidence was present on the other exhibits that she received. The TBI report reflecting Agent Nelson's findings was received into evidence.

On cross-examination, Agent Nelson testified that she did not find the Defendant's DNA on the victim's vaginal swabs, the anal swabs, the breast swabs, or in the victim's underwear. She said she did not examine the victim's bra or t-shirt. She could not determine when the pants were stained with the Defendant's semen. When asked whether it was possible that the Defendant had sex with his ex-wife, that semen was present on the bed or floor, and that the pants later came into contact with it, she said that it was not something to which she could testify, but she agreed that it was possible. She said she could not tell how the semen had been deposited onto the pants. She agreed that the DNA was found on the left buttock of the pants.

The Defendant testified that B.H. was still in diapers when she came to live with him. He said that he bathed her and her sisters and changed their diapers. He said he had seen B.H. naked "thousands" of times because she had been a baby when he married her mother. He said that seeing B.H. naked did not excite him sexually. He said that he knew everything about B.H.'s interstitial cystitis because he was a single parent and was responsible for taking her to the hospital and caring for her. He said he had read books about her condition and the best ways to help her. He agreed he was very informed about the effects and symptoms of her condition, which he described as extreme pain and staining of her underwear. He said that for a period of two to three weeks, the victim had undergone treatments for a bleeding bladder wall in which medication was injected into her bladder via a catheter. He said that as a result of the procedure, the victim bled, was in extreme pain, and experienced a discharge. He agreed that B.H. had a treatment about three or four days before November 16. He said that in all the years he had cared for B.H., the thought of having sex with her or with any of his children had never entered his mind.

The Defendant testified that on the night of November 16, he "put [Leisha Hicks] and her friend out of my house." He said he was asleep on the couch and woke to find Hicks and her friend taking the keys to his truck and his personal belongings. He said that they were leaving because he had given them a deadline to move out by the next morning. He said that Hicks and he had remained friends for thirty-one years, despite their divorce. He agreed that he and Ms. Hicks had sex in the house. He said that he believed the DNA on the sweatpants came from B.H. having lain somewhere in the house where he had engaged in sex with Ms. Hicks. He said that he did not ejaculate inside Ms. Hicks because he had hepatitis C and that he would ejaculate onto the bed or onto Ms. Hicks. He said he never used a condom.

The Defendant testified that he did not recall making a statement to Detective Minor to the effect that if any evidence were found, he was guilty. He said the only statement he made was that if Detective Minor thought he was having sex with his child, she should be taken to the hospital and examined. He said that he cooperated fully because he had no choice. He said he voluntarily gave the DNA sample and consented for B.H.'s examination.

On cross-examination, the Defendant testified that he legally adopted B.H. when she was eight or nine. He said that after Amy Hood left him with the children, he moved to Indiana for about one and one-half years. He said that he then moved to Mississippi and lived there for about four years. He said that after Hurricane Katrina, he returned to Jamestown, Tennessee. He said Ms. Hicks was living in Knoxville at the time. He said they moved to Union County together, and then Ms. Helton joined them. He agreed that B.H.'s interstitial cystitis was ongoing and that she took several different medicines for it on a daily basis. He agreed that B.H.'s testimony that he and Ms. Hicks did everything together was true at first. He agreed he had a sexual relationship with Ms. Hicks. He agreed that on the night of November 16, he awoke about 10:00 p.m., that Ms. Hicks was in the kitchen, and that Ms. Helton was in the dining room. He stated that Ms. Hicks said she was leaving. He said that the keys were hanging on the wall near where she was standing, that she was touching them, but that she did not yet have the keys in her hand.

The Defendant agreed that he gave a statement to Detective Minor on November 17, 2005, at 1:58 a.m. He said that he did not write the statement but that he signed it.[1] The statement said that Ms. Hicks was leaving and that she was standing next to the keys to his truck. He agreed that he got the keys and went back to the living room and sat on the couch. He said that Ms. Helton and Ms. Hicks went into the bedroom and closed the door. He said that when he entered the room, Ms. Hicks was looking for something in the closet. He acknowledged that he grabbed a box of checks and took them back to the living room. He

---

[1] The Defendant's signed statement was not received into evidence and is not contained in the record.

agreed that the women asked for a ride and that he told them no. He said Ms. Hicks left and Ms. Helton tried to stay, but he told her she had to leave too.

When asked if he had a close relationship with B.H., the Defendant testified that he had a close relationship with all his children. He agreed that he and B.H. had been close since the children's mother left and that he had full custody. He denied telling Detective Minor that if the detective found anything, he had done it. He confirmed that he told Detective Minor to have B.H. checked at the hospital if the detective suspected sexual abuse. He said he talked to B.H. for eight or nine months after the alleged incident, while she was in DCS custody in a foster home. When asked if he told her this was her fault, he said that he had no idea. He said they were arguing when he went to get her on July 12. When asked if he sent B.H. money to run away, the Defendant replied that he sent B.H. money to come home. He said this occurred after B.H. had been in a foster home for about six months. On redirect examination, the Defendant agreed that he had testified that he had a close relationship with his daughter, but he said that he did not have a sexual relationship with her. The jury convicted the Defendant of sexual battery by an authority figure.

**I**

The Defendant contends that the evidence is insufficient to sustain his conviction for sexual battery by an authority figure because there was no direct evidence of contact and the victim conceded that she formed her opinion that sexual contact occurred after speaking with law enforcement officers and the DCS. The State contends that the evidence is sufficient for a reasonable jury to infer sexual contact because there was proof the Defendant's face was inches from the victim's naked genitals and his semen was found on her pajamas. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A jury may use "common knowledge and experience in making reasonable inferences from evidence." State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993).

The statute pertinent to the Defendant's conviction provides:

> (a) Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant, or the defendant by a victim, accompanied by the fact that the victim was, at the time of the offense, thirteen (13) years of age or older, but less than eighteen (18) years of age, and either:
>
> > (1) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status, and used the position of trust or power to accomplish the sexual contact; or
> >
> > (2) The defendant had, at the time of the offense, parental or custodial authority over the victim and used such authority to accomplish the sexual contact.

T.C.A. § 39-13-527 (Supp. 2005). Sexual battery by an authority figure is a Class C felony. Id.

"Sexual contact" is defined in the Code as:

> [T]he intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . .

T.C.A. § 39-13-501(6) (Supp. 2005). "Intimate parts includes the primary genital area, groin, inner thigh, buttock or breast of a human being . . . ." Id. § 39-13-501(2).

Taken in the light most favorable to the State, the evidence showed that the victim was fifteen years old at the time of the offense and that the Defendant was her adoptive father. Ms. Hicks discovered the Defendant and the naked victim alone in the victim's bedroom, with the door closed and late at night. Ms. Hicks saw the Defendant standing at the foot of the bed and leaning toward the victim's naked "hind end." The victim was on her knees and

-10-

her buttocks were raised to the Defendant's face. The Defendant's face was only four or five inches from the victim's genitals. The Defendant "immediately straightened" when Ms. Hicks entered the victim's room and then followed Ms. Hicks from the victim's bedroom and threatened to kill her if she told anyone about what she had seen. For weeks following this incident, the Defendant repeatedly called Ms. Hicks and threatened to kill her. The victim's genitals were wet, and although the source of the wetness was undetermined, the victim believed that the wetness was not caused by her interstitial cystitis. The Defendant's semen was recovered from the left rear buttock of the sweatpants the victim had been wearing that night. As the trier of fact, the jury resolved all conflicts in the testimony and issues of credibility in favor of the State. The jury was permitted to use common knowledge and experience to make the reasonable inference that the Defendant had intentionally touched the victim's intimate parts. We hold that the evidence is sufficient to support the Defendant's conviction for sexual battery by an authority figure.

## II

The Defendant contends that the trial court denied his right to a fair trial by jury when it responded in the jury's presence to the Defendant's motion for judgment of acquittal that the burden of proof had been met. The State contends that the Defendant has waived this issue because he failed to make a contemporaneous objection to the trial court's statement and that the trial court's statement does not constitute plain error.

At the close of the State's proof, the following exchange occurred in the presence of the jury:

| THE COURT: | All right. The State of Tennessee has rested its case. |
|---|---|
| | For the record, [defense counsel], I will note your motion filed previous to this witness' testimony. Make it for the record at the – your motion for judgment of acquittal. |
| DEFENSE COUNSEL: | Yes, your Honor. |
| THE COURT: | At this particular point, I'm not ruling on it, but I'll allow you to proceed. |

-11-

| | |
|---|---|
| DEFENSE COUNSEL: | Some argument on the – on the Rule 29 motion? |
| THE COURT: | If you wish to make it. I mean, the Court – the Court has heard – the burden has been met as far as the Court is concerned for this case to proceed forward. |
| DEFENSE COUNSEL: | Okay. |
| THE COURT: | So you may – |
| DEFENSE COUNSEL: | So you would deny the motion despite argument? |
| THE COURT: | Yes. |
| DEFENSE COUNSEL: | Okay. |

Following this exchange, defense counsel conferred with the Defendant and announced that the Defendant intended to testify.

The Tennessee Constitution prohibits judges from commenting on the evidence in a trial, but judges may "state the testimony and declare the law." Tenn. Const. art. VI, § 9. A trial judge is obligated to "be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." State v. Suttles, 767 S.W.2d 403, 407 (Tenn. 1989). Our supreme court has reversed a defendant's conviction for sexual molestation as a result of the trial court's interviewing the ten-year-old victim, informing the jury that he had spoken privately with the victim, who was the only witness to the alleged offense, and stating that the victim was "truthful" and "believable." Id. However, this court has held that other comments touching on the evidence or a witness's credibility do not breach an unequivocal rule of law. See State v. Roy D. Wakefield, No. M2005-01136-CCA-R3-CD, Williamson County (Tenn. Crim. App. June 29, 2006) (holding that an unequivocal rule of law was not breached when the trial court stated the ten-year-old victim had "been through enough"); State v. Robert D. Walsh, No. W1999-01473-CCA-R3-CD, Shelby County (Tenn. Crim. App. June 4, 2001) (holding that an unequivocal rule of law was not breached by the trial court's comments, "See you're a good jury. You listen to everything. Whether it's real or not.").

When a judge's improper comments do not involve a central factual question, when irrefutable proof is offered to contradict a judge's comments, or when curative instructions are given, our courts have been less likely to find reversible error. See, e.g., Johnson v. Tenn. Farmers Mut. Ins. Co., 205 S.W.3d 365 (Tenn. 2006) (judge's improper comment, "I hold that's not what the [insurance] policy provides[,]" was incorrect statement of the facts, but the insurance policy was admitted into evidence, both parties testified to the provision in question, and judge's comment was brief and early in the trial); Mercer v. Vanderbilt Univ. Inc., 134 S.W.3d 121 (Tenn. 2004) (judge's improper comments that a witness was changing her testimony and was hostile were directed at a small part of one witness's testimony, jury was charged that it was sole trier of fact, and judge offered to give a curative instruction).

We note that the Defendant did not object to the trial court's statement and did not request any action, such as a mistrial, to negate any impression the trial court's statement might have made on the State's case. Such failures waive consideration of this issue on appeal. See T.R.A.P. 36(a); Kelly v. State, 477 S.W.2d 768, 770 (Tenn. Crim. App. 1972). This court may, however, in the interest of justice, recognize plain error in the record. See T.R.A.P. 36(b). Our supreme court has adopted five factors to consider when deciding whether an error constitutes plain error in the absence of an objection at trial:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

The first Smith factor is satisfied because the record establishes what occurred in the trial court. Regarding the second factor, the question is whether the statement made in the jury's presence was a breach of the clear and unequivocal rule of law.

Our supreme court has held that commenting on the truthfulness or believability of a key witness's testimony is grounds for reversal. See Suttles, 767 S.W.2d at 406-07; Graham v. McReynolds, 18 S.W. 272, 275 (Tenn. 1891). In Suttles, the trial judge commented that he had interviewed the alleged victim of a sexual assault and that he thought

the victim's testimony was important for the jury to hear. 767 S.W. 2d at 406. Because the victim was uncomfortable testifying in front of a crowd, the judge ordered the courtroom closed. He then said that the witness was "truthful" and "believable." Id. The supreme court held that the judge's comments and actions could have been interpreted by the jury as an endorsement of the victim's credibility, and it remanded the case for a new trial. Id. at 407.

Similarly, in Graham, the supreme court held that a judge's comment, "I take it that Mrs. McReynolds is doing the best she can in the matter[,]" was reversible error because it was a comment on the credibility of a key witness who was being impeached on cross-examination. 18 S.W. at 275. The court stated that the judge's comments, made during cross-examination, "naturally imported a suggestion to the jury that the Court was of the opinion that the witness was testifying in good faith . . . ." Id.

In addition, this court has held that a trial court's improper statements during the jury charge, which possibly misled the jury regarding the State's burden of proof, were grounds for reversal. State v. David Michael Chubb, No. M2005-01214-CCA-R3-CD, Sumner County (Tenn. Crim. App. Jan. 29, 2007). David Michael Chubb involved a question of credibility between an alleged victim of sexual assault and the defendant. The trial court instructed the jury that no corroboration of the victim's testimony was necessary. Id., slip op. at 20. This court held that "[t]he jury instruction effectively informed the jury that they need look no further than the victim's testimony to convict and thus implied that the jury need not consider all other proof." Id. at 21.

When taken in context, we conclude that the trial court's comment in this case essentially told the jury that the State had met its burden of proving the Defendant's guilt beyond a reasonable doubt. The jury had been instructed at the beginning of the trial that the State was required to put on evidence and had "the burden of proving the guilt of the defendant beyond a reasonable doubt." The court also instructed the jury that the State "must have proven beyond a reasonable doubt all the elements of the crime charged . . . ." After the State had rested, the trial judge, in open court and in front of the jury, said that the State's burden had been met for the trial to proceed forward. The court had just referred to the motion for judgment of acquittal. Although the jury had already been instructed that the court's instructions, rulings, and remarks during the trial were not to be taken as the court's opinion about the facts or the Defendant's guilt, we are mindful that "jurors are anxious to know the mind of the Court, and follow it . . . ." McDonald v. State, 14 S.W. 487, 488 (Tenn. 1890). We conclude that the trial court's statement could have been taken as a comment on the State's evidence and the credibility of the State's witnesses. Coming at the end of the State's proof and following the Defendant's motion for judgment of acquittal, the trial court's statement conferred credibility on the State's proof, at least from the jury's point of view. We conclude that the trial court's comment was a clear and unequivocal breach of

the law prohibiting judges from commenting on the evidence. It follows that the Defendant's right to a fair trial was adversely affected. The record reflects that the Defendant did not waive the error for tactical reasons and consideration of the error is necessary to do substantial justice.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Because the trial court's statement amounted to a comment on the evidence that conferred credibility on the State's proof, the Defendant's right to a fair trial was affected to his prejudice. The Defendant has established that plain error occurred. He is entitled to a new trial.

## III

The Defendant contends that the trial court erred in allowing the State to offer into evidence irrelevant, unfairly prejudicial, and improper character evidence demonstrating a bizarre relationship between the Defendant and the victim. The Defendant claims that the State introduced the evidence to establish action in conformity with a character trait and that the State should have requested a hearing to determine the admissibility of the witness's testimony pursuant to Tennessee Rule of Evidence Rule 404(b). The State contends that the Defendant has waived this issue because he did not seek a curative instruction after the trial court sustained his objection to the witness's testimony.

At the trial, the State questioned Leisha Hicks about the Defendant's relationship with the victim:

| | |
|---|---|
| THE STATE: | Okay. What about the relationship between her and the defendant? |
| A: | I started noticing things that I thought were strange. |
| DEFENSE COUNSEL: | I'm gonna object as to relevancy, anything – I mean, this is about an incident that occurred on November 16th about an allegation that she saw– |
| THE COURT: | What is the relevance? |

THE STATE: Your Honor, it's circumstantial evidence. There – clearly, this is a case where we have eyewitness testimony, but the relationship between the victim and the defendant is relevant to what happened the night of November 16th.

THE COURT: I'll allow some of that if it – just be – be advised that other acts of similar type – if there is something like that, . . . I will put a stop to that. Okay?

THE STATE: What did you notice about their relationship?

A. Every time he went somewhere [the victim] went with him. I mean, every time. The few times that he did try to leave the house and that she wasn't in the vehicle, she would throw screaming tantrum fits. I mean, it was – I thought that was odd.

Also, she – you know, at night when we were sitting around watching TV, she always had to be sitting next to him, almost in his lap; sitting at his feet. I thought that was odd.

DEFENSE COUNSEL: Again, your Honor, objection.

THE COURT: Sustain the objection. That's – that's clearly irrelevant.

-16-

Relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 402, 403. Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes. Id. The rule lists four requirements that must be satisfied before a court determines admissibility:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Id. 404(b)(1)-(4). We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). If the court did not substantially comply with the procedure, its decision is not entitled to deference by the appellate court. See id. at 653.

The Defendant did not request nor did the trial court conduct a hearing pursuant to Rule 404(b). Ms. Hicks's observations of the victim's behavior were permissible pursuant to Rule of Evidence 602. The testimony concerned the victim's insistence on accompanying the Defendant and her behavior when the Defendant tried to leave her at home. The testimony also concerned the victim's trying to be in physical proximity to the Defendant when watching television. There was no testimony that the Defendant elicited or encouraged these behaviors in the victim. When the Ms. Hicks testified about her belief that the behavior was odd, defense counsel objected, and the trial court sustained the objection. The Defendant did not request a curative instruction, and a failure to request a curative instruction is a failure to take action to nullify or prevent harmful error. See State v. Jones, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987). An appellate court is not required to grant relief to a

party who failed to take action to nullify a harmful error. See T.R.A.P. 36(a). Moreover, when taken in context, we cannot say that the error more probably than not affected the judgment. See T.R.A.P. 36(b). The testimony concerned the victim's behavior and not the Defendant's propensity for conforming conduct, the trial court sustained the Defendant's objection, and the trial court disallowed further testimony concerning the witness's impressions of the Defendant and victim's relationship. The Defendant is not entitled to relief on this issue.

## IV

The Defendant contends that he was denied a fair trial as a result of prosecutorial misconduct. He asserts that the State misstated the evidence during its opening statement by remarking that Ms. Hicks had observed an "odd" relationship between the victim and the Defendant and that Ms. Hicks saw the Defendant "performing oral sex" on the victim. The Defendant claims that during closing argument, the prosecutor commented on the credibility of the only witness it offered regarding sexual contact. Finally, the Defendant argues that the State intentionally misstated the victim's testimony during its closing argument. The State contends that the Defendant has waived this issue because he failed to make a contemporaneous objection to any of the statements.

Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining if the prosecutor's conduct could have improperly prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

See State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

## A. Opening Statement

In its opening statement, the State's prosecuting attorney stated that Ms. Hicks "had noticed this odd relationship between [the victim] and the defendant the time that she had been with them, and she thought it seemed a little weird." The prosecutor also said, "[Ms. Hicks] sees the defendant performing oral sex on [the victim] who is [lying] on the bed." The Defendant claims that the prosecutor intentionally misstated the evidence because these statements were unsupported by admissible proof.

The State argues and the record reflects that the Defendant did not object at the trial to any of the prosecution's statements of which he now complains. Failure to do so ordinarily results in a waiver of the issue. See T.R.A.P. 36(a); State v. Robinson, 146 S.W.3d 469, 511 (Tenn. 2004) (concluding that the defendant waived the issue of improper prosecutorial comments for failing to make a contemporaneous objection). The Defendant contends, however, that the remarks constitute plain error. See Smith, 24 S.W.3d at 282.

Although the record establishes what occurred at the trial, we conclude that no clear and unequivocal rule of law has been breached. Smith, 24 S.W.3d at 282 (quoting Adkisson, 899 S.W.2d at 641-42). In light of the Judge factors, we conclude that the prosecutor's comments did not improperly prejudice the Defendant. The prosecutor misstated the evidence in his opening statement by remarking that Ms. Hicks observed the Defendant performing oral sex on the victim. The proof presented at the trial, though, was that Ms. Hicks saw the Defendant's face mere inches from the victim's genitals. The prosecutor took curative measures during closing argument to clarify the evidence presented during the trial:

> The Defendant wasn't touching [the victim] at the time. I'm not even going to suggest to you all that when [Ms. Hicks] saw it he was touching her; that's not the case. She didn't testify to that. I'm not presenting that to you. But, I'm telling you right now, ladies and gentlemen, that if you're four to five inches from somebody's private area and you're jumping back when somebody comes in, it is as reasonable as can be that you were touching them at some point.

In addition, the trial court admonished the jury that opening statements and closing arguments were not evidence. The record does not reflect that the prosecutor had any malicious intent when he made the statement. Finally, there was no cumulative effect

-19-

because the statement about the Defendant performing oral sex was not repeated, no evidence of sexual contact was presented, and the State took steps to cure its misstatement during its closing argument. The Defendant is not entitled to plain error relief on the issue of prosecutorial misconduct during opening argument.

## B. Closing Argument

The Defendant contends that during closing argument, the prosecutor misstated the evidence, gave a personal opinion regarding a witness's testimony, and made arguments calculated to inflame the passions of the jury.

### 1. Misstatements

During closing argument, the State's prosecuting attorney said:

> Now, [the victim] has told you the pieces all fit together, and she said it was not what other people had told her, that the conversations she had with her father when he called her after these – these allegations came to light and after these crimes had been committed, he called her and told her it was all her fault – this sixteen (16) year old at the time – it was all her fault.
>
> . . .
>
> And she told you – and she said this on the stand after – actually when the Defense attorney was questioning her – that she was wet, and she initially thought that that was because of the interstitial cystitis. And this is an uncomfortable thing to talk about. She says to you today, it was not the interstitial cystitis that made her wet down there. It was because in her mind something had happened.
>
> Now, she was taking medicine, and you heard testimony from Detective Minor about the fact that she – she was groggy when he got there and she was awake and she was asleep, and she was awake and she was asleep. She couldn't stay with them the whole time, she was in and out of it. She was taking quite a number of medicines that affected her.

-20-

The Defendant claims that the victim formed her opinion about what had happened only after she spoke with Detective Minor and DCS and that there was no testimony regarding the number of medicines that the victim was taking. The Defendant also argues that the prosecutor intentionally misstated the evidence in violation of State v. Goltz and that the misconduct was so inflammatory as to affect the outcome of the his trial. See 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976).

As the State argues, the record reflects that the Defendant did not raise a contemporaneous objection at trial to any of the prosecution's argument. Nor is the Defendant entitled to plain error relief on the basis that the prosecutor's statement was factually inaccurate. The prosecutor's statement that the victim had come to believe that the vaginal wetness was not related to her interstitial cystitis was an accurate summary of the victim's testimony. The victim also testified that she was taking several medications and that they made her sleepy. The prosecution did not misstate the evidence.

2. Personal Opinion

During closing argument, the prosecutor stated:

[Y]ou know, if Leisha Hicks had made up a story – well, first of all, she didn't have any motive to make up a story, but it all fell together. The pieces fit together here, ladies and gentlemen. Even – well, whatever Leisha Hicks' bias might be able to be, and there doesn't seem to be any here, all the other pieces fall together corroborating what she said. And this DNA evidence links it all together.

The Defendant argues that a prosecutor is prohibited from expressing "his personal belief or opinion as to the truth or falsity of any testimony." Goltz, 111 S.W.3d at 6. We agree with the State that the Defendant has waived this issue for failure to make a contemporaneous objection and is limited to plain error review. See T.R.A.P. 36(a); Smith, 24 S.W.3d at 282. In conducting our plain error review, we conclude that the prosecutor's

remark that Ms. Hicks did not "seem" to have any bias could be viewed as her personal opinion about the truth or falsity of Ms. Hicks's testimony. See Goltz, 111 S.W.3d at 6-7 (describing statements that were held to be comments on the truth or falsity of witness testimony). However, the ultimate issue is not whether the prosecuting attorney's remarks were improper, but whether the improper remarks could have affected the verdict. See T.R.A.P. 36(b); Judge, 539 S.W.2d at 344-45. The prosecutor's statement was an argument that despite Ms. Hicks's alleged bias, the State believed that the evidence was sufficient to convict the Defendant of the offense charged. The jury had already heard evidence of Ms. Hicks's alleged bias and its purported basis. When taken in context, we cannot say that the statement more probably than not prejudicially affected the outcome of the Defendant's trial.

### 3. Inflaming the Jury's Passions

The Defendant also argues that the prosecutor's statement that "[The victim] was upset and she cried, but she told you some things that clearly she was uncomfortable talking about, and she wasn't excited or thrilled about talking about the – because this guy had been the father to her since she was a little kid" and other, similar statements inflamed the passion of the jury by "injecting the State's impression of [victim]'s comfort in discussing these things." The Defendant has waived this issue for failure to raise an objection at the trial and is limited to plain error review. See T.R.A.P. 36(a), (b); Smith, 24 S.W.3d at 282. The prosecutor's statements were an accurate summary of the victim's testimony, and the Defendant has not established plain error.

### V

The Defendant contends that the trial court imposed an excessive sentence when it misapplied three enhancement factors, refused to apply an appropriate mitigating factor, and denied the Defendant alternatives to incarceration. The State contends that the record supports the trial court's application of the advisory enhancement and mitigating factors. The State does not address sentencing alternatives.

At the sentencing hearing, a certified copy of the Defendant's driving history and certified copies of nine of the Defendant's convictions were received into evidence. The convictions were for driving under the influence, driving on a revoked license, public intoxication, disorderly conduct, assault, criminal trespassing, passing a worthless check, and violation of an order of protection. The psychosexual evaluation report and the presentence report were also received into evidence. The State presented no witnesses.

The trial court found that the defendant had a long history of criminal conduct and that a short sentence might depreciate the seriousness of the offense. It stated that although the Defendant was considered a favorable candidate for alternative sentencing as a matter of law, the presumption was rebutted by the evidence contained in the psychosexual report and the presentence report. The trial court applied the following enhancement factors as provided in Tennessee Code Annotated section 40-35-114: (1) the Defendant had a previous history of criminal convictions or criminal behavior above those necessary to establish the range; (4) the victim was particularly vulnerable because of age or physical or mental disability; and (7) the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement. The trial court stated that it based its decision on "the long history of criminal convictions, the age of the victim, and the mindset of the defendant that . . . these acts were committed to gratify his desire for pleasure or excitement." The trial court found no mitigating factors and sentenced the Defendant as a Range I, standard offender to the six years in the Department of Correction.

At the hearing on the Amended Motion for New Trial, the Defendant contended, the State conceded, and the trial court agreed that enhancement factor (7) did not apply because this factor is an essential element of the offense of sexual battery by an authority figure. See State v. Laurent, No. M2005-00289-CCA-R3-CD, Davidson County (Tenn. Crim. App. Feb. 27, 2006). Regarding factor (4), that the victim was particularly vulnerable due to age or mental or physical condition, the court stated that it placed greater weight on the victim's mental condition than on her age and found that the application of factor (4) was appropriate. See T.C.A. § 40-35-114(4). The court found that the application of the remaining enhancement factor, (1) a history of criminal convictions or criminal behavior in addition to those necessary to establish the range, was appropriate. See id. § 40-35-114(1). The trial court found that the weight of the remaining enhancement factors were of such a strong nature that the sentence of six years' confinement remained appropriate and that the psychosexual evaluation and presentence report showed that the Defendant was not amenable to rehabilitation. Finally, the court rejected as mitigation that the Defendant neither caused nor threatened serious bodily injury. See id. § 40-35-113(1).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2006). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, the presumption of correctness which accompanies the trial court's action "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2006).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2006); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a specific sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

-24-

T.C.A. § 40-35-210. The 2005 Amendments to the Sentencing Act "increase the amount of discretion a trial court exercises when imposing a sentencing term." Carter, 254 S.W.3d at 344. The trial court was required to consider, but was not bound by, the statutory enhancement and mitigating factors. See T.C.A. § 40-35-210(c)(2); Carter, 254 S.W.3d at 344. An appellate court "is bound by the trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346.

We note that the trial court properly applied enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. See T.C.A. § 40-35-114(1) (Supp. 2009). Certified copies of nine of the Defendant's convictions were received into evidence at the sentencing hearing. The convictions were for driving under the influence, driving on a revoked license, public intoxication, disorderly conduct, assault and battery, assault, criminal trespassing, passing a worthless check, and violation of an order of protection.

We conclude, however, that the trial court misapplied enhancement factor (4). See id. § 40-35-114(4) (Supp. 2009). Our supreme court has stated that with regard to factor (4), "the vulnerability enhancement relates more to the natural physical and mental limitations of the victim than merely to the victim's age. " State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). A victim may be particularly vulnerable if he or she is "incapable of resisting, summoning help, or testifying against the perpetrator." Id. The State bears the burden of proving the victim's vulnerability, but the evidence need not be extensive. Id.; State v. Poole, 945 S.W.2d 93, 97 (Tenn. 1997). The application of factor (4) is appropriate if the facts of the case show that the victim's vulnerability had some connection to or some influence on the victim's inability to resist, to summon help, or to testify against the defendant. State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001) (citing Poole, 945 S.W.2d at 96). A court may also give additional weight to the age of the victim when the victim is very young or very old. Id.; Poole, 945 S.W.2d at 97. However, a court may not base the application of factor (4) solely on a victim's age. Poole, 945 S.W.2d at 98. In State v. Michael Anthony Maddox, this court stated that a trial court may apply factor (4) as an enhancement to a conviction for sexual battery, in which age is an element, if the record demonstrates that the victim was unable to resist, to summon help, or to testify against the perpetrator. No. M2000-00193-CCA-R3-CD, Marshall County, slip op. at 3 (Tenn. Crim. App. Sept. 22, 2000) (citing State v. Walton, 958 S.W.2d 724, 729 (Tenn. 1997)).

The trial court erred when it applied factor (4) because it made no factual findings that the victim was particularly vulnerable, other than to state that it based the enhancement on "the mental condition of the victim." The State argued at the trial that the victim's medication rendered her particularly vulnerable because it caused her to sleep. However,

the victim testified at the trial that she was awakened by the Defendant and Ms. Hicks's argument, that she went into the kitchen, and that she returned to her room and turned on the television. Nothing in the record supports the conclusion that the victim's medication made her incapable of resisting, of summoning help, or of testifying against the Defendant. We conclude that the record does not support the application of factor (4).

### 3. Alternative Sentencing

When determining if confinement is appropriate, a trial court should consider whether (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. T.C.A. § 40-35-103(1)(A)-(C). The trial court may also consider a defendant's potential or lack of potential for rehabilitation and the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 and -114. T.C.A. §§ 40-35-103(5), -210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(4). If a defendant is an especially mitigated or standard offender convicted of a Class C, D, or E felony, he or she should be considered a favorable candidate for alternative sentencing in the absence of evidence to the contrary. T.C.A. § 40-35-102(6).

In the present case, the Defendant was considered to be a favorable candidate for alternative sentencing for the attempted sexual battery by an authority figure conviction, a Class D felony. However, the trial court found that the Defendant was not amenable to rehabilitation. According to the psychosexual evaluation, the Defendant required maximum supervision and was considered at maximum risk for violence and for re-offending if released into the community. Based upon this proof, the trial court did not err in finding that the Defendant should serve his sentence in the Department of Correction.

In consideration of the foregoing and the record as a whole, we reverse the Defendant's conviction for sexual battery by an authority figure, and we remand the case for a new trial.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE